

**FILED**
6/9/2026
THOMAS G. BRUTON
CLERK, U.S. DISTRICT COURT
AXK

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | 1:26-cr-00281 |
| | ) | Judge Matthew F. Kennelly |
| v. | ) | Case No. Magistrate Judge Gabriel A. Fuentes |
| | ) | RANDOM / Cat. 3 |
| | ) | Violations: Title 18, United States |
| RYAN ROSS, and | ) | Code, Sections 1343 and 1346 and 2 |
| VANESSA RHODES | ) | |

**COUNT ONE**

The SPECIAL NOVEMBER 2025 GRAND JURY charges:

1. At times material to this indictment:

**Relevant Entities and Individuals**

a. The Chicago Housing Authority ("CHA") was a municipal corporation located in the Northern District of Illinois that developed and operated housing throughout the City of Chicago for low-income families, the elderly, and persons with physical and mental disabilities. The CHA's housing consisted of federally funded family developments, senior housing, city and state scattered sites, and housing choice vouchers. The CHA operated primarily with federal funds that it received from the United States Department of Housing and Urban Development.

b. Defendant RYAN ROSS was employed with the CHA in the Property and Asset Management ("PAM") department as a director of property and portfolio management. As a CHA employee, ROSS was a public employee who owed a duty of honest services to the CHA in the performance of his duties. ROSS was a resident of the Northern District of Illinois.

c. Defendant VANESSA RHODES owned and operated Bell's Better Buildings, Inc., doing business as Twenty Eleven Construction, Inc. ("TEC"), a company incorporated in the State of Illinois and based in Chicago, Illinois. TEC provided general contracting and construction-related services to clients, including the CHA. RHODES had control and signature authority on bank accounts at Wintrust Bank, N.A. that received funds on behalf of TEC, including a Wintrust Bank account ending in 0634 (the "TEC Bank Account"). RHODES was a resident of the Northern District of Illinois.

d. RHODES also owned TLG Series Seven, LLC ("TLG"), a company organized in the State of Illinois and based in Chicago, Illinois. RHODES had control and signature authority on a bank account at Wintrust Bank ending in 3389 that received funds on behalf of TLG (the "TLG Bank Account").

e. Individual A owned and operated Company A, a company organized in the State of Illinois and based in Chicago, Illinois. Company A was established in or around 2019 to buy and re-sell homes. Individual A had control and signature authority on a bank account at Bank of America, N.A. ending in 9011 that received funds on behalf of Company A (the "Company A Bank Account").

f. Individual B was RHODES's husband and a TEC employee.

g. Individual C was RHODES's mother.

h. Individual D was a registered notary public.

2

i.     ROSS and Individual C had control and signature authority on a bank account at Wintrust Bank ending in 7745 in the name of Company B (the "Joint Bank Account").

### Rules Regarding CHA Employees' Financial Interests

j.     As a CHA employee, ROSS agreed to read, become familiar with, and abide by the terms of the CHA's Ethics Policy and the CHA's Employee Handbook.

k.     Pursuant to the Ethics Policy:

i.     ROSS was prohibited from making, participating in making, or in any way attempting to use his position as a CHA employee to influence any CHA decision or action in which he knew, or had reason to know, he had a financial interest distinguishable from that of the general public. A financial interest included "any and all, partial or total, present or future right" held by a CHA employee to some profit, distribution, or benefit that is valued at more than $1,000.

ii.     ROSS was prohibited from having a financial interest in any contract, subcontract, work, or business of the CHA whenever the expense, price, or consideration of the contract, subcontract, work, or business was paid with funds belonging to or administered by the CHA.

iii.     ROSS was prohibited from soliciting or accepting any money or other thing of value in return for advice or assistance on matters concerning the operation or business of the CHA.

l.      ROSS was required as part of his employment with the CHA to file an annual Statement of Financial Interests.  In the Statement of Financial Interests, ROSS was required to disclose, among other things:

i.      Any financial interest that ROSS had in any person doing business with the CHA;

ii.      Any gifts with an aggregate value in excess of $50 that ROSS received from any person doing business with the CHA, seeking or soliciting business from the CHA, or who had done business with the CHA in the prior three years; and

iii.      Any offer, acceptance, or attempted acceptance of bribes or kickbacks from any person doing business with the CHA, seeking or soliciting business from the CHA, or who had done business with the CHA in the prior three years.

m.      Pursuant to the Employee Handbook, ROSS was prohibited from, among other things: (i) giving preferential treatment in the course of his CHA employment to any organization or person unless authorized by law; (ii) mismanaging CHA funds; and (iii) soliciting or accepting any fee or other valuable thing when the fee or other valuable thing was solicited or accepted in the hope or expectation of receiving treatment better than that afforded other persons.

**Unit-Turn Work**

n.      The CHA used vendor-companies to complete certain unit-turn work on CHA public housing units.  Unit-turn work referred to the construction,

4

renovation, and other work that was needed on a public housing unit to make the unit ready for new occupancy after a prior tenant no longer resided in the unit.

o.      As part of his CHA employment, ROSS was responsible for oversight of CHA property managers, working with property managers on the completion of unit-turn work, selecting vendor-companies for unit-turn work, and approving and causing the approval of invoices from vendor-companies that performed unit-turn work.

p.      Prior to in or around January 2023, CHA property managers required vendor-companies to submit bids for unit-turn work, selected what the property manager deemed to be the most responsive and responsible bid, and submitted that bid to the PAM department for review and approval.

q.      Beginning in or around January 2023, and continuing until in or around August 2024, ROSS and other CHA employees in the PAM department whom he supervised were authorized to directly assign vendor-companies to complete unit-turn work without the use of a competitive bid process.  ROSS had final-approval authority within the PAM department over the assignment of unit-turn work to vendor-companies.

r.      Between in or around January 2023, and in or around August 2024, to be eligible for unit-turn work with the CHA, a vendor-company had to be registered as a Section-3 business with the CHA or certified as a Minority, Women, and Disadvantaged Business Enterprise ("MWDBE").

s.      In order to be registered as a Section-3 business with the CHA, a vendor-company had to meet at least one of the following criteria: (i) be at least 51 percent owned and controlled by low-income persons; (ii) be at least 51 percent owned and controlled by CHA resident(s) or resident(s) who lived in assisted housing; or (iii) be a company where at least 75 percent of the labor hours were performed by low-income persons.  In order to be certified as a MWDBE business, a vendor-company had to be at least 51 percent owned, operated, and controlled by a minority individual, a woman, or a socially and economically disadvantaged person.

### TEC's Contractual Obligations to the CHA

t.      TEC was registered as a Section-3 business with the CHA and was certified as a MWDBE business.

u.      On or about October 1, 2020, TEC, through RHODES, entered into a general contracting agreement with the CHA to provide unit-turn and other work at CHA owned or controlled properties.

v.      Between in or around November 2021, and in or around April 2023, CHA paid TEC approximately $373,622 for unit-turn work.

w.      On or about October 1, 2023, TEC, through RHODES, entered into a second general contracting agreement (the "Second GC Agreement") with the CHA to provide unit-turn and other work at CHA owned or controlled properties.

x.      In the Second GC Agreement, TEC, through RHODES: (i) agreed not to manipulate or falsify documentation required for invoicing, inspections, or other approvals; (ii) represented that no CHA employee had a financial interest

6

directly or indirectly in the GC Agreement or any compensation paid pursuant to the GC Agreement; and (iii) represented that no payment would be paid in connection with the GC Agreement by TEC to any CHA employee.

### The Scheme

2.      Beginning no later than in or around May 2023, and continuing until in or around September 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, as well as others known and unknown to the grand jury, knowingly devised, intended to devise, and participated in a scheme to defraud the CHA of the intangible right to the honest services of ROSS through kickbacks, which scheme is further described below.

3.      It was part of the scheme that ROSS solicited, agreed to accept, and accepted kickbacks from RHODES through payments made from the TLG Bank Account to the Joint Bank Account in exchange for performing acts in ROSS's position as a CHA employee to benefit RHODES, namely, the awarding of unit-turn work to TEC and Company A.

4.      It was further part of the scheme that RHODES submitted and caused to be submitted false and fraudulent documents, including contracts and proposals, to the CHA on behalf of TEC, which failed to disclose ROSS's financial interest in the proceeds of unit-turn-work payments that the CHA made to TEC.

7

5.     It was further part of the scheme that RHODES submitted and caused to be submitted documents to the CHA on behalf of Company A that falsely represented that the documents had been notarized by Individual D when RHODES knew that Individual D did not notarize the documents.

6.     It was further part of the scheme that, to conceal their financial interests in the proceeds of unit-turn-work payments that the CHA made to Company A, ROSS and RHODES submitted and caused to be submitted documents, including proposals, scopes of work, and invoices, to the CHA on behalf of Company A that falsely represented that the documents had been prepared or signed by Individual A when ROSS and RHODES knew that Individual A did not prepare or sign the documents.

7.     It was further part of the scheme that ROSS assigned and caused to be assigned unit-turn work on CHA public housing units to TEC and Company A.

8.     It was further part of the scheme that ROSS assigned and caused to be assigned unit-turn work to Company A, even though Company A was not registered as a Section-3 business with the CHA and was not certified as a MWDBE business. As ROSS and RHODES knew, Company A would not complete the unit-turn work it had been assigned because that work instead would be completed by TEC. RHODES would then receive CHA payments for the unit-turn work through Company A, a portion of which would be kicked back to ROSS.

9.     It was further part of the scheme that ROSS and RHODES submitted and caused to be submitted false and fraudulent documents, including invoices, to the CHA on behalf of Company A that falsely represented that Company A completed

8

the assigned unit-turn work on CHA public housing units. In truth, ROSS and RHODES knew that TEC had completed the unit-turn work assigned to Company A, and that ROSS and RHODES would receive the proceeds of the unit-turn-work payments that the CHA made to Company A.

10. It was further part of the scheme that ROSS approved and caused the approval of invoices submitted by TEC and Company A to the CHA for the completion of unit-turn work on CHA public housing units knowing that he would receive kickback payments from RHODES in connection with that unit-turn work.

11. It was further part of the scheme that, after Company A received payments from the CHA for unit-turn work that TEC had actually completed, ROSS instructed Individual A to keep a portion of the payments the CHA made to Company A and transfer the remainder of those funds to RHODES through cashier's checks made payable to TLG.

12. It was further part of the scheme that, through the submission and approval of those invoices, ROSS and RHODES caused the CHA to issues checks and initiate electronic funds transfers to bank accounts associated with TEC and Company A, including the TEC Bank Account and the Company A Bank Account.

13. It was further part of the scheme that, after Individual A transferred CHA funds that Company A received to RHODES, RHODES paid and caused to be paid to ROSS kickbacks of a portion of those CHA funds.

9

14.     It was further part of the scheme that, to conceal the kickback payments to ROSS, RHODES transferred funds from the TLG Bank Account to the Joint Bank Account so that ROSS could withdraw the kickback proceeds.

15.     It was further part of the scheme that ROSS and RHODES caused Individual B, RHODES's husband, to falsely represent himself to CHA property managers to be a Company A employee who would complete the unit-turn work on CHA public housing units that ROSS assigned and caused to be assigned to Company A.

16.     It was further part of the scheme that ROSS concealed and caused to be concealed from other CHA employees the unit-turn work that he assigned and caused to be assigned to Company A through the submission of false and fraudulent periodic written updates to CHA leadership, in part because ROSS knew that Company A was not registered as a Section-3 business with the CHA and was not certified as a MWDBE business.

17.     It was further part of the scheme that, after the CHA notified ROSS on or about September 19, 2024, that his employment with the CHA was being terminated, on the following day, on or about September 20, 2024, RHODES withdrew the remaining funds in the Joint Bank Account in order to conceal and disguise the existence, source, and purpose of the kickback payments that she had transferred to the Joint Bank Account to make available for ROSS.

## Concealment and Misrepresentations

18.     It was further part of the scheme that ROSS falsely omitted the income that he received from RHODES on the 2024 Statement of Financial Interests form he submitted to the CHA to conceal and disguise the existence, source, and purpose of the kickback payments that he received from RHODES.

19.     It was further part of the scheme that in the 2024 Statement of Financial Interests form ROSS submitted to the CHA, ROSS answered "no" to the following question: "Have you been offered or accepted or attempted to accept any bribes or kickbacks from any person currently doing business with the CHA, seeking or soliciting business from the CHA, or who has done business with the CHA[?]," when, in truth, ROSS knew that he had been offered and accepted kickback payments from RHODES in exchange for ROSS awarding CHA business to TEC and Company A.

20.     It was further part of the scheme that RHODES falsely represented in the Second GC Agreement that "no officer, agent, or employee of the CHA" had a "financial interest directly or indirectly in this Agreement or the compensation to be paid hereunder," when, in truth, RHODES knew that ROSS, a CHA employee, had a financial interest in the compensation that TEC would receive from the CHA.

21.     It was further part of the scheme that ROSS, RHODES, and others did misrepresent, conceal, and hide, and caused to be misrepresented, concealed, and hidden, the existence and purpose of the scheme and the acts done in furtherance of the scheme.

11

22. As a result of the scheme:

i. Between in or around May 2023, and in or around August 2024, ROSS awarded and caused to be awarded approximately $3,128,942 in CHA payments to TEC for unit-turn work on CHA public housing units, and approximately $1,749,300 in CHA payments to Company A for unit-turn work on CHA public housing units;

ii. Between in or around June 2023, and in or around March 2024, in exchange for ROSS's awarding of unit-turn work to TEC and Company A, RHODES funded the Joint Bank Account with approximately $421,970 of funds derived from payments from the CHA for unit-turn work, which funds were made available to ROSS; and

iii. ROSS withdrew and used at least approximately $217,100 of the kickback payments that RHODES had transferred to the Joint Bank Account for his benefit, including to purchase a vehicle and pay for home repairs and renovations.

23. On or about July 28, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an electronic funds transfer of approximately $244,200 from an account at BMO Harris Bank to the TEC Bank

Account, which transfer of funds represented a payment by the CHA for invoices submitted by TEC on or about July 20, 2023;

In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.

## COUNT TWO

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 22 of Count One of this indictment are incorporated here.

2.      On or about March 13, 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an electronic funds transfer of approximately $112,000 from an account at BMO Harris Bank to the TEC Bank Account, which transfer of funds represented a payment by the CHA for an invoice submitted by TEC on or about February 11, 2024;

In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.

## COUNT THREE

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 22 of Count One of this indictment are incorporated here.

2.     On or about August 11, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an electronic funds transfer of approximately $186,000 from an account at BMO Harris Bank to the Company A Bank Account, which transfer of funds represented a payment by the CHA for an invoice submitted in the name of Company A on or about July 20, 2023;

In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.

15

## COUNT FOUR

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1. The allegations in paragraphs 1 through 22 of Count One of this indictment are incorporated here.

2. On or about March 15, 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an electronic funds transfer of approximately $440,800 from an account at BMO Harris Bank to the Company A Bank Account, which transfer of funds represented a payment by the CHA for invoices submitted in the name of Company A on or about March 1, 2024;

In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.

16

## COUNT FIVE

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 22 of Count One of this indictment are incorporated here.

2.     On or about July 31, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, data relating to Company A's purchase of Cashier's Check #1593336418 in the amount of $94,000 with funds from the Company A Bank Account and made payable to TLG;

In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.

17

## COUNT SIX

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1. The allegations in paragraphs 1 through 22 of Count One of this indictment are incorporated here.

2. On or about March 18, 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, data relating to Company A's purchase of Cashier's Check #1630614045 in the amount of $405,000 with funds from the Company A Bank Account and made payable to TLG;

In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.

## **COUNT SEVEN**

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1.      The allegations in paragraphs 1 through 22 of Count One of this indictment are incorporated here.

2.      On or about October 17, 2023, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an electronic funds transfer of approximately $36,870 from the TLG Bank Account to the Joint Bank Account;

In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.

19

## COUNT EIGHT

The SPECIAL NOVEMBER 2025 GRAND JURY further charges:

1.     The allegations in paragraphs 1 through 22 of Count One of this indictment are incorporated here.

2.     On or about March 21, 2024, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

RYAN ROSS, and
VANESSA RHODES,

defendants herein, for the purpose of executing the scheme to defraud, knowingly caused to be transmitted by means of wire communication in interstate commerce, certain writings, signs, and signals, namely, an electronic funds transfer of approximately $86,500 from the TLG Bank Account to the Joint Bank Account;

In violation of Title 18, United States Code, Sections 1343 and 1346 and 2.

**FORFEITURE ALLEGATION**

The SPECIAL NOVEMBER 2025 GRAND JURY alleges:

1. Counts One through Eight of this indictment are incorporated here for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2. As a result of their violations of Title 18, United States Code, Sections 1343 and 1346, as alleged in Counts One through Eight of this indictment,

RYAN ROSS, and<br>
VANESSA RHODES,

defendants herein, shall forfeit to the United States any and all right, title, and interest they have in any property, real and personal, which constitutes or is derived from proceeds traceable to the offenses in Counts One through Eight.

3. The property to be forfeited by defendants as a result of their violation of Title 18, United States Code, Sections 1343 and 1346, includes, but is not limited to, a personal money judgment in the amount of approximately $4,878,242.

4. If any of the property described above, as a result of any act or omission by a defendant: cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party; has been placed beyond the jurisdiction of the Court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty, the United States of America shall be entitled to forfeiture of substitute property, as provided in Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1).

All pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

A TRUE BILL:

_____

FOREPERSON

_____

UNITED STATES ATTORNEY